**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 14 CR 301-1 |
| v. | ) | |
| | ) | Judge Matthew Kennelly |
| NEAL GOYAL, | ) | |
| | ) | |
| Defendant. | ) | |


**DEFENDANT NEAL GOYAL'S SENTENCING MEMORANDUM**

Defendant, Neal Goyal, by his attorneys, Thomas More Leinenweber, James L. Kopecky and Howard J. Rosenburg, submits this sentencing memorandum in support of his request for a sentence of 18 months' imprisonment followed by five years of supervised release. The sentence requested is "sufficient, but not greater than necessary" to achieve the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2).

As set forth below, the seriousness of Neal's offense is substantially mitigated by his complete lack of criminal history, the fact that he confessed to these crimes quickly, that he cooperated with the authorities immediately providing complete and thorough information and seeks to work to repay his victims. There is no need to incapacitate Neal for more than 18 months to prevent him from committing further crimes, given his extraordinarily low risk of recidivism.

The guideline range applicable in this case, 121-151 months, provides no useful advice, as it was not developed based on empirical data or national experience, and fails to satisfy any purpose of sentencing. Further, a sentence of more than 18 months would be far greater than necessary to achieve the purposes of sentencing.

## I. FACTUAL BACKGROUND

Neal Goyal, now 34, was a law-abiding citizen with no criminal history before committing the instant offense. He was hardworking, deeply involved in his community, and was a dedicated husband and parent.

At age 25, Neal founded and operated Blue Horizon Management Group ("Blue Horizon"), which managed several investment funds, Blue Horizon Funds and Caldera Equity Funds ("Caldera" is misspelled in the Presentence Investigation Report as "Calder"). From 2006 through 2014, Neal raised a total of $11,732,173 from investors in the funds that he oversaw. Of

that total, it is estimated that Neal's legitimate trading accounted for a loss of approximately 20% of the funds raised, or $2,346,434.60. Of the remainder, $9,385,738.40, $2,878,565 was paid back to investors. *Presentence Investigation Report*, p. 7, ¶¶ 22, 23. The remaining amount was $6,507,173.40, which is the true actual loss to the investors solely due to Neal's crimes. In addition, Neal objects to the phrase used in the *PSR* that the remaining funds "were misappropriated for his own use." While undoubtedly true that the funds were misappropriated, the phrase "for his own use" leaves the reader with the impression that Neal spent all the money on himself. Again, it is undisputed that he spent large amounts of misappropriated funds on himself and his family, but as the Government concedes in its version of the offense to Probation, the actual amount spent by Neal for personal use was $2,145,395. *See Government's Version of the Offense*, *Sources and Uses of Funds for All Accounts*, chart 2/2.

Why did Neal Goyal commit these crimes? In late 2006, Neal began to make series of terrible decisions. In his letter to the Court, Neal describes his downfall:

> From the moment I set out to launch a fund, I was up and running within three months. My parents, being the supportive parents that they always were, were my very first investors. I was so incredibly happy. Everything was going well in those first few months. My attitude was positive, and I had so much pride. After all, this new company was my baby, and I was so proud of it. I was 25 and excited at my prospects for success.
>
> As time passed, I had some missteps in trading that resulted in losses on trades that went against me. As the quarter drew to a close, I was staring at an 8% loss. I was speechless. Stunned. I would have to tell my investors that my report card as a steward of their funds resulted in a significant loss. That meant the possibility of buyer's remorse from my investors and an impairment of my ability to attract new funds. At the same time, I believed that if I only had a little extra time, I could successfully invest to erase those losses. 8% may not sound overly dramatic, but to me, it took on a much greater meaning. To me, it meant failure. It meant admission of the possibility that I made the wrong career choice. It meant that my parents would forever be concerned about my life choices. Although it was probably not a reality, it may have meant that I would have to close the doors of my business. That meant that I would it would have to be announced publicly that I was a failure.
>
> This thought process kept me up for night upon nights. And in preparing the quarterly reports for the few investors I had, I stared at that loss as if it could be the end to my business. There it was, my huge fork in the road. Do I report an 8% loss, risking humiliation and angry investors, or do I tell them that everything is going well in hopes of making up ground in the next quarter? My own paranoia and worries led me to believe that the truth would be the end to my business. So I took that negative 8% loss, and changed it to a positive number. There is was. The single largest mistake I could have ever made, I did it. I took all of the amazing values my parents had taught me, and chose to ignore them. I chose ego over truth.

\* \* \*

In 2009, the urgency to earn an income began to accelerate. I would have a family that I need to support, and I had a huge problem that I needed to fix. So in mid-2009, I started a new and separate investment firm. The real purpose behind that firm was to start over fresh, start a new fund, and do it the right way. I genuinely believed I would be able to make the new endeavor a success to repay the losses in the earlier funds, and then eventually phase them out by returning those investors' money to focus on the new company.

All was going as planned until a few quarters later, a few investors had to withdraw money from the earlier funds. But because of how the assets of those funds had already shrank, those withdrawals left the fund with almost no assets. And there were still investors that believed they had money in those funds. The pressure in my head continued to mount every single day. I continued to believe that somehow I could grow the new company to make up for the prior losses.

At the same time, pressure also continued to build for me to become financially independent […]. I feared that when I got married, I would have to show my wife that I was earning a significant income.

So that is when I made the first of a new wave of wrongful decisions. I withdrew $8,000 from the fund for my own personal use. I remember that day like it was yesterday. I had taken my wife out for a fancy dinner with a full afternoon and evening on Rush Street. She told me, "Wow, you are so amazing. You are an amazing man. I am the luckiest girl in the world, and I never thought I would meet a guy like you." In my mind, that somehow validated that I need to give her all that she could ever dream of. She never asked for it, but it was notion that I made up in my own head. I needed to give her the world.

*Letter from Neal Goyal*, attached as Exhibit A.

When his scheme began to fall apart, Neal confessed immediately to the United States Attorney's Office, the FBI and the Securities and Exchange Commission. He spoke openly and honestly with them giving a proffer without a proffer letter. He allowed the FBI to search and remove items from his office without a warrant. At the United States Attorney's Office's request, he testified against himself before the grand jury. Neal located a buyer and executed a contract to sell his home prior to the receiver being appointed in an effort to proactively cooperate with the liquidation of his assets. He cooperated fully with the receiver appointed in the SEC's case against him. He aided the receiver in selling his possessions.

After moving to San Diego to live in a home owned by his mother-in-law, Neal obtained employment almost immediately. He started working for Propel Marketing Group ("Propel") in San Diego as a trainer for sales associates. He works full time for Propel, which is a startup company and is earning $1,000 per month. Although his monthly income is low, he believes there are significant opportunities to earn more in the future, as Propel has offered Neal future equity stake in the company as well as profit sharing opportunities by allowing Neal to open his own regional division. He is well liked at the company, which is aware of the case at bar, and

the company has indicated that they would hire Neal back after his incarceration. In his letter to the Court, Richard Greenley, the Regional Director of Propel, writes of Neal's honesty regarding his crime:

> Starting with our rigorous interview process, Neal has been completely forthcoming and genuine with all interactions, including his legal indiscretions. I found his candor and genuine need for us to understand his legal mistakes to be quite refreshing. It's rare these days to find a person, especially during the interview process to not try to be more than they are.

> In fact, his professionalism and integrity along with his generous and kind spirit have and continue to be a guiding light for our new and young sales reps, as well as our more seasoned staff. Many of them view Neal as a mentor, leader and friend. I have trained and managed many large teams of sales professionals in the past 25 years and Neal is the rare breed of person that one wishes they had 20 more just like him.

> * * *

> Although we are well aware that we may lose him for an indefinite period of time there are no reservations in having him, if he so desired, back on the team.

*Letter of Richard Greenley, dated February 12, 2015*, attached as Group Exhibit B, No. 9.

Remarkably more than 65 people - friends, family, business associates, even investors - have written to the Court on Neal's behalf. A common theme arises out of the letters – that Neal Goyal is a decent person, a wonderful father, husband and son and someone always willing to help others and that the crimes he committed do not come close to defining him. Neal's friend Mayank Ruia writes about a friend who was there for him in a time of need:

> Neal stood by my side and helped me through my toughest hour . . . I was out of a job whilst living in New York City. In my case this was a particularly trying time as I had no family to lean on. Neal helped me fight through it. He offered any and all help he possibly could, including a place to live. All it took, sir, was one phone call. I can never forget the magnitude of graciousness and his desire to ascertain the well-being of those he cared about. I find it safe to say that had it not been for Neal's timely and unconditional help perhaps my life would have taken a different journey all together. Neal never allowed me to feel the absence of my own family. Instead he simply took me in as a member of his own. He invited me to his home for Thanksgiving each year, which eventually led them to becoming my adopted family in the US. He did little things like take the time to pick me up from and drop me off to airports just because he felt it would help me. He never expected a thing in return.

*Letter of Mayank Ruia, dated February 6, 2015*, attached as Group Exhibit B, No. 47..

College friend Ryan Jacobs writes, "I can't even describe how good of a person he genuinely is. Whenever I needed help, whether it was advice, schoolwork or just some of his

time, he would drop everything and be there for me. Neal is not just a friend to me, but a brother, and someone I look up to . . . What occurred is not within his character." *Letter of Ryan Jacobs, dated March 2, 2015*, attached as Group Exhibit B, No. 31. Michael Cozzi, another close friend, had this to say: "I understand what he is accused of and the magnitude of the accusation. Whatever may come of Neal's life, his family's life, resulting from the Courts' decision, please believe that everything I have known about Neal Goyal comes from that mold of compassion, kindness and giving. He is a great friend, an even better husband and father." *Letter of Michael Cozzi, undated*, attached as Group Exhibit B, No. 20.

His friend John Kelley perhaps summarizes Neal's actions is most direct way possible, "Perhaps his need to keep those close to him protected and happy is what caused him to go down this path. By no means do I justify his actions or defend them in any way. But what I will say is that Neal did not go down this path with intentional malice. He is not a master criminal that planned on stealing money from his investors. I believe he made a horrible decision that he thought he would be able to correct, which then spiraled out of control. He realizes this, and he has to live with the fact that because of it, he has hurt those closest to him which is a wound that can never fully heal." *Letter of John Kelley, undated*, attached as Group Exhibit B, No. 37.

Neal's sister Anita Vijay Goyal writes of the great sadness and disappointment that she has for her brother's actions but her realization that there is more to the story:

It is with great sadness and sincerity that I write this letter to you, pleading mercy from this Honorable Court. I cannot presume to make a case surrounding the facts of Neal's mistakes. What he did was wrong, no question. However, it is very important to me that I share with you my insight, as his little sister, on who Neal is in addition to the wrong choices he has made.

Let me start with this: I am beyond disappointed. I do not show my brother anger. In fact I have not wanted to show him anything but solidarity and support in this crushing time. But no, Your Honor, I did *NOT* expect this from my big brother. Not Neal. Not anyone, but certainly not Neal. Anyone close to me will tell you that Neal was my idol—not for what he did or for his 'success' but for a principle he taught me. You don't have to be born into a talent or position or any which way to be able to get somewhere—because character and proof in action are the ultimate measure. You can be imperfect and still make change. You can falter and still grow into someone of value. And you ought to be generous and kind in everything you do. He motivated me, he believed in me, and I too believed in him. He was a black sheep, an underdog, and encouraged me, another black sheep and underdog, to work hard and create my own journey. Sadly, the man I looked up to, for what he taught me, lost track of that creed himself.

Neal wasn't the brightest or the most savvy—that's not how he made his name. He was passionate and motivated to earn his place and his respect. He was raised to love, and that is how he lives. But somewhere along the way, he failed. He lost when he should have gained. And instead of coming clean with his shortcomings, he tried to outrun them. I can't imagine how alone one must feel to not tell their family of the lack of success. That is my biggest regret: that we did not give him the space and the safety to admit he

couldn't keep up.  Even George Soros didn't succeed his first time around, and now he's the leader of one of the largest investment funds. Now I don't think Neal's life is destined for a comeback career around finance. But I do wish he had realized that even in the face of losing, there could have been a high road taken. And even still there could be.

As for the road he took, you never expect it to happen from the people you believe in. The reality is, no one is above temptation to prove and no one is above making mistakes. Good people can do wrong things. And in turn, they need to make up for it—in one way or another.

Your Honor, I cannot speak to the details of Neal's punishment. People of high character do make mistakes, and as a society we need to hold them accountable.  However, often times there is collateral damage. And I ask you very humbly, Judge, to please consider what could be the possible collateral damage that Neal was not wise enough to see: the damage to his family and his investors.

\* \* \*

Certainly it is the right of society and investors to see through the need for Neal to be punished. However, it's these same people who deserve the solution to their problem. Neal is committed to returning what he wrongfully took from his investors. And I believe his efforts to do so, by earning a faithful living, are owed to those people affected. Every day he spends outside prison walls, both before and after, I know Neal will demonstrate—as he already has—character and proof in action in mending his mistakes to those individuals and the society at large that lost out.

As for Neal—It is likely obvious what I wish for Neal.  I wish for him to be the brother, the husband, the father, the son, the friend and the leader I have always loved in him.  I don't think that will ever change, no matter how much he may fear it, and no matter how far off that may appear when he stands before you. But what I can say with great faith: this will not happen again.  Neal is surrounded by people who *will* hold him accountable. And Neal himself has realized exponentially for the past year the weight of his actions.

Sometimes it takes being rock bottom, losing it all, making the mistake ourselves to realize the value in front of us and what we are to do with it. For Neal, I don't know if it would have come another way. But I do believe, Your Honor, that Neal wants to remedy his wrongs, he deserves to be held accountable, and he will not take for granted a second chance.

*Letter of Anita Vijay Goyal, dated April 15, 2015,* attached as Group Exhibit B, No. 26.

We have received countless letters like these, all attesting to Neal's integrity, generosity of spirit, and truly admirable character, all of which paint a picture of the man before this Court. Further, many of those submitting letters to the Court on Neal's behalf lost large amounts of money due to Neal's actions.  Despite this, Punam Bhandari, Neal's aunt, who lost $50,000, states:

He is a good family man, a doting father . . . He is very remorseful of his actions. In view of this, I wanted to appeal to you to give him a chance to rehabilitate in society and give back to the community to his utmost capacity.

*Letter of Punam Bhandari, undated*, attached as Group Exhibit B, No. 6.

Another family member who invested and lost $400,000, Arun Jethanandani, M.D., finds the compassion to write:

None of us understand why he did what he did. Maybe he didn't want to hurt investors by telling them that he had lost their money, believing that over time he would recover the loss. Neal is not a sociopath, on the contrary he is terrified of hurting people and now he has made his nightmare come true.

Neal is a wonderful father to his 3 young boys and takes equal part in raising them as their mother does.

\* \* \*

I believe Neal is already punishing himself and will continue for the rest of his life . . . I don't have much knowledge of law other than truth and accountability. But I do know something about human nature, I don't think Neal is a criminal even though his actions and decisions were wrong and effected many people.

*Letter of Arun Jethanandani, M.D.*, undated, attached as Group Exhibit B, No. 7.

Neal's brother-in-law invested and lost $50,000 with Neal but he finds the compassion to write the Court:

It is with a heavy heart that I write this letter on Neal Goyal's behalf. I understand very well the gravity of Neal's transgressions. Neal, however, is much more than the sum of his crimes. He is a dedicated husband, father, and friend. I am Neal's brother-in-law, godfather to his children, and also one of the investors in his fund. I had invested money with him about 2 months before he was brought up on charges. Though initially I was incredibly        hurt        by        Neal's        actions,        I        fully        support        him        now.

I am writing this letter because I sincerely wish for leniency for Neal. I have seen with my own eyes the pain and suffering Neal is going through, and his honest wish to get his life back on track for the sake of his investors and his family. If he struggled with conscience previously, he does not now.

I have the utmost respect for our judicial system and understand fully the consequences of his actions. My hope is that the system recognizes proper punishment for Neal's crimes would include getting him back into the work force as soon as possible. He is a very caring, charismatic, intelligent man, and he is more than capable of being a productive member of society.

Through all of the past 7 years of knowing Neal, I have always enjoyed watching how sincerely he cares for his family, how he always lived life to the fullest, and how he was able to bring joy to everyone around him. He has an infectious personality and smile. He was the one most people in his life turned to when they were down and out. He was always there to lift everyone's spirits and to show them hope when they were at their lowest. His family and friends always relied on him as a shoulder to cry on, as a source for their strength, and most importantly as a source for laughter.

I have asked myself many times why he would have taken my money and I believe I know the answer. Neal had lied to himself long enough that he stopped believing what he was doing was wrong. He had compartmentalized his life and became two separate people. He stopped understanding the difference between right and wrong. Neal never set out to harm anyone. He never set out to steal anyone's life savings. One lie turned into hundreds and before he knew what he was doing. He also believed in his heart that he was going to find a way to make all of the money back.

I have spent a fair amount of time with Neal before and after this situation has unfolded. I remain his friend and staunch supporter. He has broken the hearts of every member of his family, but everyone that has had the chance to spend time with him recently, understands his heart now.

I have told Neal that I have forgiven him for his mistakes, and he can't understand why. I have forgiven him because I can see in his eyes that he is learning first hand what a life without consequences does to a person. He is learning that we are all held accountable to each other. I see him as a broken man, yet also see clearly that he wants to make right what is wrong in his life. I understand he will be punished for his crimes, but I also believe that the shorter his term is, the better it will be for society at large. He is an intelligent man and he is more than capable of being productive. The aspects of his personality that were previously lacking, are filling in through deep self-reflection. He is finally asking the right questions about life and he has realized how far he has strayed from the values he was brought up with.

After I look past the remorse and guilt on his face, I still see a glimmer of his infectious personality. It would be a shame not to share that with the rest of the world. I think he understands why the majority of us wake up, kiss our kids, put in a long day at work, and come back home to do it all again. There is nobility in living an honest life and for the first time, Neal is seeing where true happiness stems from. He will not make these kinds of mistakes again in life. He will not seek the short cut. I truly believe that Neal is a changed person.

The justice system is hopefully meant to not only punish, but also to reform the guilty. My sincerest wish is that you will be able to see that even the people who have been directly wronged by Neal's actions can see Neal will suffer for the rest of his life regardless of his jail term. I want Neal to have a second chance because I believe in him. He is now a man with a real conscience and beating heart. Please allow him to redeem himself by getting back to society as quick as possible.

*Letter of Vikas Patel, M.D., dated March 30, 2015* attached as Group Exhibit B, No. 11.

Neal's misguided actions stem, at least partially, out of a desire to please those closest to him. Alan Childs, M.A., Psy.D., interviewed Neal extensively regarding this matter. Dr. Childs states in his report of his interview and testing of Neal that:

> Neal stated that upon much reflection, the following themes highlight how he eventually broke the law. First, Neal felt a strong internalized need to achieve greatness. Along with this, he felt a need to carve a different path than his family had established, and he needed to prove that his path was the right path (failure was not an option). Lastly, Neal always believed he held the role as the leader of his family, and this belief eventually consumed him. He needed everyone around him (friends, peers, family) to look at him as a leader. The thought of disappointing his family and friends, or admitting failure, was too much for Neal to fathom.

> * * *

> Several months later, Neal realized that his investment performance was not living up to his (and others') expectations.

> At this time, Neal began to worry. He realized that he risked having to inform his handful of investors, whom had entrusted him with their money, that his investments were not profitable. Neal commented, "In order to have a millionaire invest in your fund, you have to convince them that you are capable of making them millions more." As a result, he allowed himself to be portrayed as a "boy genius." Meanwhile, Marti encouraged him with comments such as, "wow, you are doing something really great here." He couldn't bring himself to admit to her that things were not going as planned.

> Neal stated that there were four different parties whom he couldn't admit failure to: His wife, his parents, the investors, and the general public. Neal knew that if he told anyone, he would be admitting failure to the world and he would be disappointing all four sets of parties that he cared deeply about.

> While losses continued to mount, Neal was reporting that there were positive returns. He recalls one specific day in 2007 when he and his wife were enjoying the day out eating on Rush Street. It was a few days after the quarter had ended. He lost 8% that quarter, and wanted to avoid thinking about it as much as possible. During their outing, Marti looked at him and said, "Wow, I am the luckiest girl in the world. How did I get so lucky?" Hearing these words from his wife, Neal said to himself, "I can't lose this; this is too perfect; I can't disappoint her." The next day, he reported an 8% gain rather than an 8% loss. The misreporting and misuse of funds snowballed from there.

> Neal stated that his intention was never to lie to his investors but rather to make up for those losses and get their money back in time. The next quarter, he had a positive return of 4%, but due to his misreporting the previous quarter, he still had to fib on the

statement to investors because it didn't add up with the 8% loss last quarter . . . Neal continued to take more and more risks to try and make up for the losses.

*Report of Alan Childs, M.A., Psy.D*, attached as Group Exhibit C.

It is clear from Neal's own account of what happened here and Dr. Childs' report and simple common sense that Neal's obsessive need to please others surely played a role in how he found himself before this Court.

Neal asks the Court to consider not just his criminal acts, but also his lack of prior criminal history, his genuine desire to make restitution to the victims and his immediate confession and cooperation with the authorities. A sentence within the advisory guideline range is far, far in excess of what is fair and just in this case. A sentence of 18 months imprisonment and five years of supervised release is the just result.

## A. Collateral Consequences

As a result of this offense, Neal has suffered the loss of his occupation and his reputation. The SEC has permanently barred him from ever associating with any entity in the financial services business. He lost his home and all but very few possessions, as everything with value was turned over to the receiver. He has had to move his family across the country to live in a home provided by his mother in law. He faces time away from his wife and young children that he so desperately loves. In his letter to the Court, Neal describes the effects of his disastrous decisions on his life now:

With my countless lies, poor choices, and unethical actions, I have hurt the investors in ways that are unimaginable. It may be hard to believe, but I cared deeply for every single investor. I knew everything about each one of them, and was a confidant to them in ways that were outside the realm of finance. My own parents were investors, along with my sister, aunts, uncles, and best friend. Most of the other investors were dear friends of mine or my parents.

I know that I hurt every single investor. They lost a great of hard-earned money, to a person who they believed to be a friend. My actions have not only impacted their financial security, but have also created emotional scars for them that may never heal. They trusted me with not only with their financial matters, but in many cases as a life coach, mentor and advisor in family matters, career uncertainties, and life challenges that they faced. With my awful decisions, I took that that trust they put in me, abused it, and betrayed them. I can recall every single conversation I had with every single investor, remembering with utmost clarity, the sickness and internal agony I felt knowing I had lied right to their face. These were wonderful people, and I am a rotten individual for what I did to them.

Where I am Today and My Promise

One year has passed since my family's world came crashing down. My wife, who initially questioned whether I am the man she fell in love with, is still standing by my side today. I have questioned her countless times as to why she is still with me after learning about all the lies I told and people I hurt. She tells me every time, that she continues to stand by my side because of the amazing husband, father, and individual that I am. In the low place that I am right now, I find those words hard to believe, but I hang on to them believing that I will be given a second chance to prove that I am that man she speaks of.

My three children, Ethan (4), Gavin (2), and Mason (10 months), are all happy and cheerful kids. They believe their father is a super hero. I spend every day holding their little faces, telling them bedtime stories, and cherishing every moment I have with them. Someday when they are old enough to comprehend, I will have to tell them what I did. But my promise to them is that I will use this experience to teach them about what it means to become honest and hardworking men. I will teach them how even the whitest of lies can create problems. I will teach them that failure is ok. I will teach them that they have to prove their worth only to themselves, and not worry about impressing the world.

The investors are amazing people. They trusted a kid like me with their savings and gave me a chance. I abused that trust they placed in me. Regardless of my punishment, I will work the rest of my life, and not sleep until every single investor is paid back in full. Whether the investors afford me the chance to redeem myself or not, I know in my heart that I *will* redeem myself to them. They may never forgive me for what I did, but my promise to them, my family, and myself is that I will do everything in my ability to make this right. I will earn every new dollar honestly, and devote all of it to making the investors whole again.

*Letter from Neal Goyal*, Exhibit A.

## II.   A   SENTENCE   OF   EIGHTEEN   MONTHS   IMPRISONMENT   WOULD BEST SATISFY THE GOALS OF § 3553(a).

The Court must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)," which are "the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."

18 U.S.C. § 3553(a)(2). In "determining the particular sentence to be imposed," the Court must consider these purposes, the nature and circumstances of the offense and the history and characteristics of the defendant, the need to avoid unwarranted disparities, and the need to provide restitution to any victims of the offense. *See* 18 U.S.C. §3553(a)(1)–(7).

"While the fraud guideline focuses primarily on aggregate monetary loss and victimization, it fails to measure a host of other factors that may be important, and may be a basis for mitigating punishment, in a particular case." Allan Ellis, John R. Steer, Mark Allenbaugh, *At a "Loss" for Justice: Federal Sentencing for Economic Offenses*, 25 Crim. Just. 34, 37 (2011); *see also United States v. Ovid*, slip op., 2010 WL 3940724,9*1 (E.D.N.Y. Oct. 1, 2010) ("[T]he fraud guideline, despite its excessive complexity, still does not account for many of the myriad factors that are properly considered in fashioning just sentences, and indeed no workable guideline could ever do so."). A substantial variance is needed in this case because of the following mitigating factors, all of which are highly relevant to the purposes of sentencing and none of which is taken into account by the guideline range.

## A. Need for Just Punishment in Light of the Seriousness of the Offense

The need for retribution is measured by the degree of "blameworthiness," which "is generally assessed according to two kinds of elements: the nature and seriousness of the harm caused or threatened by the crime; and the offender's degree of culpability in committing the crime, in particular, his degree of intent (*mens rea*), motives, role in the offense, and mental illness or other diminished capacity." Richard S. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality"Relative to What?*, 89 Minn. L. Rev. 571, 590 (February 2005). The guidelines include none of the factors bearing on Neal's degree of culpability.

As is oft recited, "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall*, 128 S.Ct. at 588 (2007), quoting *Koon v. United States,* 518 U.S. 81, 113 (1996). As aptly stated by a sentencing court not long ago:

[S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant."

*United States v. Adelson*, 441 F.Supp.2d 506, 513-14 (S.D.N.Y. 2006).

## 1. Mr. Goyal intended to replace the misappropriated funds.

A defendant's motive is highly relevant at sentencing. S*ee Wisconsin v. Mitchell*, 508 U.S. 476, 485 (1993); *United States v. Mahan*, 2007 WL 1430288, at *3 (10th Cir. 2007); *United States v. Milne*, 384 F. Supp. 2d 1309, 1310-11 (E.D. Wis. 2005) (granting variance where "defendant did not take the bank's money out of greed or a desire to live a lavish lifestyle, [but in effort] to keep a sinking business afloat"); *United States v. Ranum*, 353 F. Supp. 2d 984, 990 (E.D. Wis. 2005) (defendant did "not act for personal gain or for improper personal gain of another").

There is no excuse for what Neal has done. It is not in dispute that he never should have converted his client's funds for his own use. According the PSR, Neal paid investors back approximately $2,878,565, or approximately 31 percent of the total amount. (*PSR*, at p.7, ¶) 22) He genuinely, if foolishly, believed that he could repay all of the money he had misappropriated.

In short, this case is distinguishable from a case in which a defendant misappropriates money to support a lavish lifestyle. Neal's motive was irrational, certainly, but not driven purely by greed. He believed, however unrealistically, that he would eventually be able to repay the funds he had taken.

Further, Neal's extensive cooperation with the receiver in this matter has aided the receiver in obtaining approximately $785,000 with which to repay the investors. Prior to the receiver being appointed, Neal asked the SEC and the Government for permission to sell his family home thereby maximizing the amount that the buyer paid. Finally, Neal's family has an extraordinary belief in Neal and his family and friends have collected over $342,000 in funds to help repay those damaged by Neal's actions. Collectively, these funds amount to in excess of $1 million for the victims in this case. This amount of money is not enough, surely, to make the victim's whole but it stands in contrast to many defendants who do nothing to help their victims. As Neal said in his letter to the Court:

> Whether the investors afford me the chance to redeem myself or not, I know in my heart that I *will* redeem myself to them. They may never forgive me for what I did, but my promise to them, my family, and myself is that I will do everything in my ability to make this right. I will earn every new dollar honestly, and devote all of it to making the investors whole again.

Exhibit A. When Neal says this, this Court should believe him.

### 2. Mr. Goyal's conduct was aberrant.

Neal lived a law-abiding life until the instant offense began as a young law student. He was an active member of the community, and a dedicated husband and father. His offense is completely uncharacteristic when viewed in the context of his entire productive adult life. This Court should grant a variance based on the aberrant nature of his conduct. *See, e.g.*, *United States v. Howe*, 543 F.3d 128 (3rd Cir. 2008) (variance based on "isolated mistake" in otherwise long and entirely upstanding life); *United States v. Hadash*, 408 F.3d 1080, 1084 (8th Cir. 2005) (defendant was a "law abiding citizen, who [did] an incredibly dumb thing"); *United States v. Davis*, 2008 WL 2329290 (S.D.N.Y. June 5, 2008) (defendant was a first offender who had

worked throughout his 15-year marriage to educate his six children and whose offense was prompted by economic pressures).

In her letter to Your Honor, Marti Goyal, Neal's wife, writes:

Neal and I have known each other for ten years, and have been married for six. I am writing to you to show you who the man behind this all truly is. He has done more right in his life, than wrong. That is why I am still holding his hand, and standing beside him every day through this challenging time in our lives. The man I met ten years ago and the man I am with today, is a good man. He is a man who lives his life for everyone else. He is loved. He gives back. All he ever wanted was to make everyone around him happy. My husband was brought up to respect, love and give back to the world. I fell in love with a man who has, from the moment I met him, had the purest heart I have ever known. He is a leader, he is strong, and he is a hero to not only his three children and myself, but to many people in his life. Life lifted him off the ground, and but the realities of our current life have him right back down.

In the years I have known Neal, he has supported and given so much to his family, friends and community. That is why our family and friends have stood by our sides to help us get through this.

* * *

One of the hardest things for me is to see the guilt, pain and remorse that Neal feels. As much as he is finally able to live life free of lies, the pain and turmoil that he has caused the investors and his family is unbearable for him. He lives every day trying to redeem himself, to better himself, to do anything he can do to try to heal the pain he has caused. He reflects on what happened, who he had become, and cannot even begin to understand why he did what he did. He battles with his emotions and strength to continue on, and fights to someday help repay everyone. He wishes he could erase any pain and sorrow he has caused to them. It pains him inside knowing the he hurt people that he cared so deeply about, friends and family members who all trusted and cared about him and our family. He wishes he had asked for help to fix this problem sooner. He lives his new reality, knowing he has to prove to the investors, friends, and family that he can make a wrong, a right. He knows he cannot change the past, but he can fix the future. He lost everything, we lost everything, but not as much as those that were affected by this. We still have our family and we still have our health. He is young and he has the ability to work and prove to everyone that he can make this situation whole again.

When I look back at what happened, I see a young man, trying to reach the top and pushing himself to achieve his goal, too quickly. We both were raised knowing we can do anything we put our hearts into. Whatever you decide to do give it 110% and never say never.  There are times in life when that pressure to show your family and friends that you accomplish success becomes an obsession, and that is what happened to my husband…a young man, who couldn't admit failure because he wanted to keep a smile on everyone's face. Someone who so badly wanted to give his friends and family everything

they wanted, but got caught up and could not fix the problem. No one can take blame for what Neal, even though we have all blamed ourselves in some way, or thought about what we could have done differently. Neal and I have spent our entire lives trying to prove ourselves to our elders. I am not sure if it's a generational thing but it's not easy. The pressure to be the best, to be rewarded only for accomplishments rather than just for being yourself is not easy. . . We put a lot of pressure on our children to be better than we are, to be smarter, and to make more money. We reward them when they get a good grade, when they win a game, but sometimes we forget to just love and praise them just for being themselves. Neal always told me that he believed he was the black sheep of the family because he was not a doctor, that he was not the smartest of his siblings, that he thought different then they did, and always was searching to make his family proud of him. I believe to this day that is one of the reasons Neal and I are so connected. I always struggled with this myself, with my mother. One thing, I know is that Neal is extremely bright and has the ability to pay these investors back quickly. Being put away from his family will only prolong this effort.

I am by no means am dismissing what my husband has done or making any type of excuse. I am rather telling you, who the man behind this situation is. He is a genuine man, who has a wife, three beautiful children and who would give anything to fix this problem, better himself and not be separated from his family. He was irresponsible and naive to not realize how this would impact the investors and his entire family.

* * *

Neal is my life. I cannot breathe without him. Please do not take my husband away from us. Please allow us to work together as a family to make this situation whole again and to repay everyone who was hurt for their pain and losses in their lives. I need my husband in our life, to help me raise our kids, to help us grow my business, pay our bills, keep our household together and to get our life back on track. I cannot do that alone. I worry that my kids will resent my husband, and they will not understand. I cannot bear having to hear, 'where is daddy?' and not being able to tell them he will be right back. I cannot bear having to take them to see their father in a place that will make them believe that their father is a 'bad guy,' as that is all they will understand. I do not want my boys to feel pain, feel betrayed, or feel left behind or unwanted by their father, as that is the complete opposite of how their father is with them. I have the chance to raise three educated young men, that will someday be as amazing men as their father but I worry that without their father, they will not know or learn what true love is or what being a father is. Children are molded by their parents, by their upbringing, their surroundings, their home environment. That burden and pain on me will be unbearable. I worry about their wellbeing, and my ability to provide them with a fully functional mother that keeps the household strong. I depend on my husband, and our kids need him to grow and become good young men. Please allow for Neal to continue to be the role model and superhero to our boys. Let him teach from his mistakes and mold them into solid young humble men.

There will never be enough words to tell everyone how awful we feel about what has happened. But I know by our actions, we can show everyone that was hurt that we are

truly sorry and that we will forever work to better ourselves and to make this better for everyone.

*Letter of Marti Goyal,* attached as Exhibit D.

Neal's wife and family have chosen to stand behind Neal because they realize that there is more to him than the circumstances of this crime. While it is not unexpected that his parents, siblings and other blood relations have written the Court to express their support, it is the letters from his in-laws that are particularly telling. His mother-in-law Sally Fernandez writes:

> As a mother, I had to get to the core of what had happened. I had to know how best to advise my daughter who had no idea what had happened or what the future would hold. Should she leave him? What kind of man was he? Had I missed a character flaw in him? So, shortly after my arrival when the time was right with my daughter present, I interrogated Neal like the fiercest of prosecutors asking question after question to understand what he had done, when did it start, how much was the damage, where did the money go, what had he done to try to repair matters, etc... I had to get to the core of the problem to figure out was Neal a bad person? Was he evil? I needed to know. Unlike, I suspect the other family members; I knew firsthand what a bad person looked like. I knew what evil looked like.
>
> * * *
>
> So as I tried to uncover who my son-in-law is, now at 57 years old with all of my experience I knew Neal was not a bad person. I knew Neal wasn't evil. I knew for sure he had a good soul. I told Neal at the end of the interrogation, he had lost his soul and he needed to find it and get it back inside. What I learned about my son-in-law, who I now call my son, is that he had and still has a very good soul. Neal was simply a naïve young man who believed he could fix the problem he had created. He had no idea the problem he created was like a snowball rolling down a hill growing and growing over time. I knew the biggest mistake he made was not asking for help when he knew the problem had begun.

*Letter of Sally Fernandez*, dated *April 27, 2015*, attached as Group Exhibit B, No. 1.

Neal's father-in-law, Martin Fernandez, writes movingly:

> I am a common man. I believe that being a good father is a great achievement in life . . . My son Neal made mistakes and he has faced up to those mistakes that he made. To my knowledge he has fully cooperated with everyone as this legal matter comes to a final conclusion. During these events he has been remorseful for his actions. He has made every effort to right his wrongs and to be respectful to everyone as well as continue to be a good husband and father to his children.
>
> * * *

My background in Law Enforcement has enforced my belief in the Judicial system. I also believe that our Judicial system has the power to look at each event with an open mind and to determine if a person is truly remorseful for his actions. I hope that through your decision making process you come to the conclusion that Neal has true remorse. His cooperation with everyone in this matter should speak volumes as to his commitment to right his wrongs to everyone who has been negatively affected by his actions.

*Letter of Martin E. Fernandez, undated,* attached as Group Exhibit B, No. 2.

Finally, Marti Goyal's aunt, Jo Anne Garza Cunningham, a former FBI agent, wrote the following;

Although I do not condone Neal's criminal actions, I have spent many hours in thought trying to assess the impact of a sentence of incarceration. My experience is that sentencing should serve as a deterrent and rehabilitate. I truly believe that Neal can positively contribute to society. Aside from the negative impact on him personally and his family, incarceration may otherwise destroy his ability to repay society. Neal will forever have to live with the impact of what he has done but if given a chance he can take responsibility for his behavior and repay his debt to society and his family.

*Letter of Jo Anne Garza Cunningham, dated June 15, 2015*, attached as Group Exhibit B, No. 21.

**3. Mr. Goyal immediately confessed and cooperated with law enforcement.**

On May 21 and 23, 2014, Neal voluntarily met the U.S. Attorney, the S.E.C. and the FBI and made a full confession. It is undisputed that he has told the full truth every time the authorities called on him to do so. He waived his right to be prosecuted by way of indictment and proceeded by way of an information. He has given a proffer with the Government without the security of a proffer letter and, at the Government's request, appeared before the grand jury. He has cooperated in every way possible, including selling his family home before the receiver was appointed to secure a higher price to aid paying back the investors. He further aided the receiver sell his possessions.

**4. Since his arrest, Mr. Goyal has acted in an exemplary manner.**

On May 28, 2014, Neal was charged in the case at bar by way of the filing of an Information**.** Within three weeks he was already employed by Propel Marketing Group in San Diego. Neal is and always was a driven and hard working person. He wishes to provide for his family and refused to give up on his life despite his past mistakes. He continues to be a loving husband and an incredibly devoted father to his three boys.

Neal and his family are religiously devoted and attend Shivalya Temple, which was founded by Neal's parents. Neal is filled with remorse for his actions but wisely blames no one by himself. One of the hardest things for him to deal with is the pain he has caused the investors. He seeks to atone for his sins. As Your Honor is aware, the Court kindly granted Neal's request to send apology letters to his investors. Neal had run into an investor by accident in San Diego

and desperately wished to apologize to her and the other investors. He wanted the investors to know how deeply ashamed and sorry he was for his horrible actions. This belief of Neal's is profound and truly felt by him.

### a. Founded "Repeat the Feat" Charity

As part of his desire to make amends to the world at large for his actions, Neal and Marti founded a charity, "Repeat the Feat." *See* *http://www.repeatthefeat.org/* Neal describes the purpose behind Repeat the Feat:

> As a father of 3 children, I cannot help but imagine the impact on my children's upbringing that my horrible decisions could have had, if I had continued down this path. As I had lost sight of what I should have been doing, my children could have easily grown up to become people with inflated egos wanting to be at the world's center and believing that money was the source of happiness. I am so angry at myself for opening the possibility of that.

> This hurdle in my family's life served as a reminder of something I loved throughout my entire life – charitable and community involvement. I have always been an active member in charities, non-profits, and various charitable causes. At this juncture in my life, this takes on an even greater meaning. I want to not only continue to give back, but I want to teach my young children to do the same. I want them to grow up knowing that the world needed help, and that they should devote time each day towards helping someone else in need. They should grow up as humble individuals that are grateful for what they have.

> In January of this year, I founded a non-profit organization called Repeat the Feat. Through the organization's website, we allow parents to order free inspirational t-shirts for their children. The purpose of the t-shirt is help the child understand that when they wear their shirt, their role is to help the community in some way. All parents want to teach their kids how to give back to their community. However, not everyone is able to find a regular and consistent method of integrating these values into their child's weekly schedule. So with this program, I have created a free platform for parents where they can order these shirts for their children as a tool to teach them how to become a contributing member of their community.

> In the short 6 months since founding this program, we have shipped over 1,000 free shirts, taught 944 children how to give back to their community, helped 26 homeless shelters, launched 19 food and clothing drives, and organized 22 environmental cleanup events.

> The response has been overwhelming, and brings me a great deal of emotion. I have always wanted to help the world, but my previous methodology in doing so was the wrong way. The feedback I receive every single day from parents around the country as to how this program has been so effective in teaching their children amazing charitable values, has opened my eyes as to how real change can happen. I learn every day how us,

as parents, have to be role models to our children. A role model is not about how much money we make, or about how successful we are, but how you work hard every day to make a positive impact on the world.

*Motivation Behind Repeat the Feat*, attached as Exhibit E.

## B. Need for Deterrence

Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006). "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." *Id.*; *see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity.").

Typical of the findings on general deterrence are those of the Institute of Criminology at Cambridge University. *See* Andrew von Hirsch *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999), summary available at http://members.lycos.co.uk/lawnet/SENTENCE.PDF. The report, commissioned by the British Home Office, examined penalties in the United States as well as several European countries. *Id.* at 1. It examined the effects of changes to both the certainty and severity of punishment. *Id.* While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance." *Id.* At 2. The report concluded that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects." *Id.* At 1. Research regarding white collar offenders in particular (presumably the most rational of potential offenders) found no difference in the deterrent effect of probation and that of imprisonment. *See* David Weisburd *et al.*, *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995); *see also* Gabbay, *supra*, at 448-49 ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders.").

Under the circumstances of the case at bar, a sentence of imprisonment is obviously warranted. However, the purpose of sentencing in federal court is succinctly put: the sentence must be 'sufficient, but not greater than necessary.' 18 U.S.C. §3553(a). Numerous studies show that deterrence is achieved by the certainty of a sentence of imprisonment not by the length of that imprisonment.

## C.    Need for Incapacitation

### 1. Mr. Goyal has an exceptionally low risk of recidivism.

Neal who is 34 years old, is a first time offender, a college and law school graduate, was employed throughout his adult life, was married for almost seven years, and has no history of

drug or alcohol abuse. For all male offenders in Criminal History Category I, the recidivism rate is 15.2%. For those who are college graduates, the rate in Criminal History Category I is just 7.1%; for those who have been employed, the rate is 12.7%; and for those who were ever married, the rate is 9.8%. For those with no history of illicit drug use, the recidivism rate is half that of those who do have a drug history. For those like Neal who are educated, have been employed, are married, and are drug free, the recidivism rate is certainly much lower. *See* U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines,* at Exh. 9, at 28; Exh. 10, at 29 (May 2004) [hereinafter *Measuring Recidivism*].

For all Category I defendants convicted of fraud, the recidivism rate is just 9.3%, the lowest of any offense category, which is 45% below the rate for all fraud offenders. *Id.*, Exh. 11, at 30. Finally, offenders like Neal with zero criminal history points have a rate of recidivism half that of offenders with one criminal history point. *See* Sent'g Comm'n, *Recidivism and the "First Offender,"* at 13-14 (May 2004) [hereinafter *First Offender*].

In imposing the least sentence sufficient to account for the need to protect the public from further crimes of Neal, this Court should consider the statistically low risk of recidivism presented by Neal's history and characteristics. *See, e.g.*, *United States v. Darway,* 255 Fed. Appx. 68, 73 (6th Cir. 2007) (upholding downward variance on basis of defendant's first-offender status); *United States v. Hamilton*, 323 Fed. Appx. 27, 31 (2d Cir. 2009) ("the district court abused its discretion in not taking into account policy considerations with regard to age recidivism not included in the Guidelines"); *United States v. Urbina*, slip op., 2009 WL 565485, *3 (E.D. Wis. Mar. 5, 2009) (considering low risk of recidivism indicated by defendant's lack of criminal record, positive work history, and strong family ties); *United States v. Cabrera*, 567 F. Supp. 2d 271, 279 (D. Mass. 2008) (granting variance because defendants "with zero criminal history points are less likely to recidivate than all other offenders").

**D.      Need to Provide Restitution to Victims of the Offense**

In determining the appropriate sentence, this Court must consider "the need to provide restitution to any victims of the offense." *See* 18 U.S.C. §3553(a)(7); *see also, e.g.*, *United States v. Menyweather*, 447 F.3d 625, 634 (9th Cir. 2006) (acknowledging district court's discretion to depart from guidelines to impose probationary sentence, since the "goal of obtaining restitution for the victims of Defendant's offense . . . is better served by a nonincarcerated and employed defendant"); *United States v. Peterson*, 363 F. Supp. 2d 1060, 1061-62 (E.D. Wis. 2005) (granting a variance so that defendant could work and pay restitution). The victims in this case deserve restitution, and Neal wishes to provide it. He is college-educated and hardworking. There is every reason to believe that after he is released from prison he will be able to find employment and this Court should seek to maximize, rather than eliminate, Neal's ability to make the restitution the victims have demanded.

In her letter to the Court, Nancy Neilsen, a victim who lost $50,000 in this matter, wrote:

The sum of money I invested with Neal represents a large portion of my savings and was a significant amount for me. However, if Neal goes to prison, it will prolong my

difficulty and make recovery that much harder for me and other investors. I find it preferable to give Neal the opportunity to help undo the damage and repay the investors. He is hard working and possesses the ability to repay the investors if given the opportunity. I am requesting that Neal be given this chance to make reparations.

*Letter of Nancy Neilsen, dated April 15, 2015* attached as Group Exhibit B, No. 5.

Another victim, Renu Jain, has written this Court to plead for leniency in Neal's case. Dr. Jain writes:

I am one of the investors with Blue Horizon Funds managed by Neal Goyal. This is an addendum to the letter written to VNS. Please see the attached letter as well.

I have known Neal ever since he was a baby (2 weeks old). We have known the Goyal family since 1980. They are very well respected in the community. I have seen Neal being raised with good family values. He always came across as a hardworking, intelligent & a caring young man, who went on to obtain a Law degree. Because of such close relationship with Neal and the family, I trusted him and invested my life savings with him. The mistake he did is incomprehensible.

The harm caused to me & my family by this fraud is beyond explanation. Despite all this, I feel very strongly that he be given a chance to make it up to his investors. By putting him in jail for long time will not be helpful to the investors to recover their losses. This incident will help Neal to become the person he truly was before committing this crime.

I hope you will take this into consideration before sentencing him to prison.

*Letter of Renu Jain, dated June 22,, 2015* attached as Group Exhibit B, No. 8. Of the victims that have written letters on Neal's behalf, their losses were the following:

| | |
|---|---|
| Arun Jethanandani | $400,000 |
| Punam Bhandari | $50,000 |
| Vinod and Vijay Goyal | $220,000 |
| Vikas Patel | $50,000 |
| Nancy Neilsen | $50,000 |
| Renu Jain | $800,000 |

Pointedly, neither Renu Jain or Nancy Nielsen are related to Neal in anyway.

**E. Need to Avoid Unwarranted Disparities and Unwarranted Similarities**

In the first quarter of 2015, sentences below the guideline range were imposed in 51.6 % of all cases; 30.4% were government-sponsored, 21.2% were non-government sponsored. *See* U.S. Sentencing Commission, *Preliminary Quarterly Data Report*, tbl. 1. In fraud cases, the percentage is even greater. According to the Sentencing Commission for the first quarter of

2015, 58% of the fraud sentencings were below the guidelines. *Id.* at tbl.3. "[S]ince *Booker*, virtually every judge faced with a top-level corporate fraud defendant in a very large fraud has concluded that sentences called for by the Guidelines were too high. This near unanimity suggests that the judiciary sees a consistent disjunction between the sentences prescribed by the Guidelines for cases like these and the fundamental requirement of Section 3553(a) that judges imposes sentences 'sufficient, but not greater than necessary' to comply with its objectives." Frank O. Bowman III, *Sentencing High-Loss Corporate Insider Frauds After* Booker, 20 Fed. Sent. R. 167, 169, 2008 WL 2201039, at *4 (Feb. 2008).

A variance is necessary to do justice in this case, and will also contribute to the evolution of responsible guidelines. As the Supreme Court emphasized, when judges articulate reasons for sentences outside the guideline range, they provide "relevant information to both the court of appeals and ultimately the Sentencing Commission," which "should help the Guidelines constructively evolve over time, as both Congress and the Commission foresaw." *Rita*, 551 U.S. at 357-58.

The Court must consider the need to avoid unwarranted disparities among defendants with similar criminal histories convicted of similar criminal conduct. 18 U.S.C. § 3553(a)(6). The court should avoid unwarranted similarities in sentencing among defendants who are different in ways not accounted for in the guideline range, *see Gall v. United States*, 552 U.S. 38, 55 (2007) ("need to avoid unwarranted *similarities* among other co-conspirators who were not similarly situated"); *United States v. Ovid*, 2010 WL 3940724 (E.D.N.Y. 2010) (sentencing two defendants with similar guideline ranges to 60 months and 126 months respectively based on distinctions in circumstances of the offenses and characteristics of the defendants), and unwarranted differences among defendants whose conduct and characteristics are similar. *See United States v. Parris*, 573 F. Supp. 2d 744, 753, 756-62 (E.D.N.Y. 2008).

A brief survey of sentences imposed in significant financial fraud cases further buttresses the conclusion that a sentence well below the advisory guidelines is appropriate here.

The following is a chart summarizing the advisory guidelines and the actual sentences given to defendants in a number of large financial fraud cases – most with far worse conduct by, and far greater gain to, the defendant than is present in Neal's case. What becomes clear is that, based on the facts of this case, Neal's sentence should be well below 2 years, if for no other reason than to avoid an unwarranted disparity with other comparable cases.

### Chart of Sentences for High Loss Financial Fraud Defendants

| Defendant | Case/Citation | Guideline Loss Amount | Guideline Range | Sentence Imposed | Facts/Comments |
|-----------|---------------|-----------------------|-----------------|------------------|----------------|
|           |               |                       |                 |                  |                |

| Defendant | Case/Citation | Guideline Loss Amount | Guideline Range | Sentence Imposed | Facts/Comments |
|---|---|---|---|---|---|
| Richard P. Adelson | *United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006) | $50-$100 million; Court used intended loss not actual loss from stock price, which could have been as high as $716 million, because "numerous other contemporary marketplace factors also contributed to the decline in Impath's stock." | Life imprisonment | 42 months | CEO of public company convicted of conspiracy, securities fraud, and three false filing counts. Court noted "the utter travesty of justice that sometimes results from the guidelines' fetish with absolute arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense" *United States v. Adelson*, 441 F.Supp. 2d 506, 512 (S.D.N.Y 2006) |
| Isaac Ovid | *United States v. Ovid*, No. 09-CR-216 JG, 2010 WL 3940724 (E.D.N.Y. Oct. 1, 2010) | Greater than $7 million | 210 months | 60 months | Hedge fund manager guilty of conspiracy to commit securities fraud. The reasons the Court gave for the downward departure included: (1) this was not a pump and dump scheme or something that started as a fraud; (2) despite the expenses being "excessive," they were not "$2 million parties" and there was no evidence "he was siphoning off money out of the company for his own personal gain;" (3) defendant believed that "this was actually going to work." |
| Dennis Campbell | *United States v. Campbell*, No. 1:CR-08-007, 2010 WL 2650541, at *6 (M.D. Pa. July 1, 2010) | $119 million | 210 months (but statutory max of 60 months) | 24 months | Defendant convicted of conspiracy to commit mail fraud related to falsely representing that they awarded contracts to disadvantaged business enterprises. The fraud spanned thirteen years. Guideline range would have been 210 months if not for statutory maximum. |

| Defendant | Case/Citation | Guideline Loss Amount | Guideline Range | Sentence Imposed | Facts/Comments |
|---|---|---|---|---|---|
| Jamie Olis | *United States v. Olis*, No.03-CR-217-01, 2006 WL 2716048, at *10 (S.D. Tex. Sept. 22, 2006) | $79 million. Court used intended loss because actual loss, calculated to be as high as $714 million. The fraud could not be separated from non-fraud related news about company. | 151 months | 72 months | Dynegy tax executive convicted of securities fraud, mail and wire fraud, and conspiracy, and found to be "intimately involved in the conspiracy and in planning." Court found fact that conduct did not result in substantial pecuniary benefits to him "mitigate[d] against the type of harsh sentence that may be deserved in cases where the defendant's conduct enriched him at the company's detriment or brought about the downfall of the company." *Id.* at *12. |
| Kenneth K. Livesay | *United States v. Livesay*, No. 2:03-cr-0018, dkt # 83 (N.D. Ala 2010); facts discussed in *United States v. Livesay*, 587 F.3d 1274, 1278 (11th Cir. 2009) | More than $1 billion | 78 months | 5 months | Defendant convicted of conspiracy to commit wire fraud, securities fraud, and falsifying books and records and falsely certifying financial information filed with the SEC related to scheme to artificially inflate company earnings. |

| Defendant | Case/Citation | Guideline Loss Amount | Guideline Range | Sentence Imposed | Facts/Comments |
|---|---|---|---|---|---|
| Eric Butler | *United States v. Butler*, 264 F.R.D. 37, 39 (E.D.N.Y. 2010) | $250,000, which represented the proven gain from the defendant's offense because "the loss attributable to the offense was found to be impossible to determine" despite the government's calculation of $1.1 billion resulting in a guideline range of life imprisonment. *Id*. at 39-40 | 72 months | 60 months | Financial services industry executive convicted of securities fraud. Court found that Butler "took advantage of his clients' trust, and defrauded them of amounts of money… which may—at the upper bound, as contended by the government—be in excess of one billion dollars" and disregarded his responsibility to the financial well-being of his clients for the sake of his own short-term financial gain." *Id.* at 39-40. In explaining the downward departure, the court noted that the defendant was "supported by family and friends, and a wife and child." Court also noted that the "staggering sums involved" reflected "more than the magnitude of defendant's fraud" noting failures in the financial services regulatory community. |
| Roger Faulkenberry | *United States v. Faulkenberry*, 759 F. Supp. 2d 915 (S.D. Ohio 2010) | $2.89 billion | Life Imprisonment | 120 months | Founder of National Century Financial Enterprises convicted of securities fraud, money laundering, and conspiracy. Court found that "conspirators went to enormous lengths to disguise and conceal their operations from the outside world" and defendant specifically was aware of employees falsifying data to investors and acted as a primary contact for both investors and ratings agencies. *United States v. Faulkenberry*, 461 F. App'x 496, 497 (6th Cir.) |

| Defendant | Case/Citation | Guideline Loss Amount | Guideline Range | Sentence Imposed | Facts/Comments |
|---|---|---|---|---|---|
| Donald H. Ayers | *United States v. Ayers*, 759 F. Supp. 2d 945, 948 (S.D. Ohio 2010) | $2.89 billion | Life Imprisonment | 120 months | Founder of National Century Financial Enterprises found guilty of securities fraud, money laundering, and conspiracy. Believed to be at the time the largest fraud involving a privately-held company in the country. |
| Sanjay Kumar | *United States v. Kumar*, 617 F.3d 612, 634 (2d Cir. 2010) | Greater than $400 million but estimated to be as high as $1 billion | Life imprisonment | 144 months | CEO of Computer Associates pled guilty to charges of securities fraud, wire fraud, making false public statements with the SEC and making false statements to the FBI. Court held "[t]o impose th[e] sentence[s] [recommended by the Guidelines] in this case would shock the conscience of this Court ... [and] the conscience of the reasonable person." |
| Ira Gentry | *United States v. Jenkins*, 633 F.3d 788, 796 (9th Cir. 2011) | $9 million. The Court chose to use this value, which represented all of the defendant's ill-gotten gains, as opposed to $26 million, the "'more controversial and disputable'" amount based on stock prices." *Id.* at 809. | Life Imprisonment | 180 months | Defendant found guilty of conspiracy, securities fraud, wire fraud, tax evasion, and various money laundering charge related to a "pump and dump" scheme. Gentry, the head of the company, and co-defendant Jenkins, an attorney assisting in the scheme, netted almost $9 million in proceeds, using "the bulk of the funds for personal purchases and investments," including a $1.5 million house. |
| Randy Jenkins | *United States v. Jenkins*, 633 F.3d 788, 796 (9th Cir. 2011) | See above | 324 months | 90 months | See above |
| Mehdi Gabayzadeh | *United States v. Gabayzadeh*, 428 F. App'x 43, 50 (2d Cir. 2011) | $193 million | Life imprisonment | 180 months | CEO convicted of bank and securities fraud related to a fraudulent $400 million bond offering that would have resulted in him keeping $100 million for himself |

| Defendant | Case/Citation | Guideline Loss Amount | Guideline Range | Sentence Imposed | Facts/Comments |
|---|---|---|---|---|---|
| Michael Peppel | *United States v. Peppel*, No. 3:06-cr-00196, dkt #272 (S.D. Ohio 2013); facts discussed in *United States v. Peppel*, 707 F.3d 627, 631 (6th Cir. 2013) | $18 million | 97 months | 24 months | Trader and publicly traded company pleaded guilty to conspiracy to commit securities, mail, and wire fraud. Along with conspiring to falsify accounting records and financial statements, defendant also engaged in insider trading resulting in over $6 million in profit. |
| Matthew Martoma | *United States v. Martoma*, No. 12 CR. 973 PGG, 2014 WL 4419682, at *1 (S.D.N.Y. Sept. 8, 2014); facts explained in *United States v. Martoma*, No. 12 CR. 973 PGG, 2014 WL 4419682, at *1 (S.D.N.Y. Sept. 8, 2014) | $283.1 million | 188 months | 108 months | Portfolio manager convicted of securities fraud related to insider trading. Loss amount was calculated by determining the gain Martoma received, which avoided the issue of accounting for extrinsic market factors. |
| Robert Catoggio | *Catoggio v. United States*, No. 04 CV 4553, 2007 WL 2276057, at *1 (E.D.N.Y. Aug. 7, 2007) (discussing the sentencing) | Greater than $80 million (highest loss bracket in 1997 guideline manual) | 210 months | 141 months | Defendant pled guilty to racketeering and conspiracy for participation in pump and dump scheme involving several stocks. |
| Morad Abu Sliman | *United States v. Sliman*, 449 F.3d 797, 802 (7th Cir. 2006) | $26 million | 57 months | 57 months | Defendant pled guilty to conspiracy to make and possess counterfeit and forged checks. Defendant had counterfeited over $26 million in checks, which monies he and his coconspirators kept. |

| Defendant | Case/Citation | Guideline Loss Amount | Guideline Range | Sentence Imposed | Facts/Comments |
|---|---|---|---|---|---|
| Weston L. Smith | *United States v. Smith,* 181 F. App'x 898, 899 (11th Cir. 2006) | $327 million | 300 months | 27 months | Defendant pled guilty to conspiracy to commit wire fraud and securities fraud; falsely certifying financial information and filing false reports with the SEC. Guideline range was actually life imprisonment but statutory maximum was 300 months fir three counts consecutively. |
| Ivy Woolf Turk | *United States v. Turk,* 626 F.3d 743, 744 (2d Cir. 2010) | $27 million | 121 months | 60 months | Defendant pled guilty to conspiracy to commit mail fraud and wire fraud in relation to a scheme whereby she falsely told real estate investors that their loans were secured by first-mortgages when they were not, resulting in all of her victims losing their investments. |
| Michael Gluk | Facts discussed in *United States v. Baker*, No. A-13-CR-346-SS, 2014 WL 3007691, at *3 (W.D. Tex. July 2, 2014) | $756 million (based on government calculations). *United States v. Baker,* No. A-13-CR-346-SS, dkt #321, (W.D. Tex. August 22, 2014) | Life imprisonment | 120 months | CFO of ArthroCare Corporation found guilty of securities fraud for, among other things, misrepresenting revenues to investors. |

In *United States v. Parris*, 573 F. Supp. 2d 744 (E.D.N.Y. 2008), Judge Block in the Eastern District of New York took a similar collection of cases into account in fashioning an appropriate sentence for two securities fraud offenders. At the court's request, each party submitted a sample group of cases to illustrate the sentences imposed in other securities fraud cases. *Id.* at 752. Based on these samples, the court concluded that "[t]hose [defendants] who were not cooperators and were responsible for enormous losses were sentenced to double-digit terms of imprisonment (in years); [while] those whose losses were less than $100 million were generally sentenced to single-digit terms." *Id.* at 753. The court relied on this national pattern in arriving at a sentence of 60 months for the two defendants who faced an advisory guideline range of 360 months to life, which was 16.7% of the bottom of the applicable guideline range. *Id.* at 745.

## III. THE GUIDELINE RANGE PROVIDES NO USEFUL ADVICE BECAUSE IT IS NOT BASED ON EMPIRICAL EVIDENCE OR NATIONAL EXPERIENCE, AND FAILS TO PROMOTE ANY PURPOSE OF SENTENCING.

## A.    Advisory Guideline Range

The Probation Officer has calculated an advisory guideline range of 121-151 months, resulting from an adjusted offense level of 32 and Criminal History Category I. The guideline range offers no useful advice because it (1) is the product of a guideline that is not based on empirical evidence or national experience; (2) fails to take any account of Neal's low risk of recidivism, need to make restitution, or collateral punishment; (3) would result in unwarranted disparity as compared with sentences for similarly situated defendants; and (4) is far greater than necessary to promote the goals of sentencing in this case.

When Congress enacted the Sentencing Reform Act of 1984, it directed the Commission to promulgate guidelines that "assure the meeting of the purposes of sentencing," 28 U.S.C. § 991(b)(1)(A), and to use average sentences imposed and prison time actually served in the preguidelines period as a "starting point." 28 U.S.C. § 994(m). The Commission was then to continually review and revise the guidelines in light of sentencing data, criminological research, and consultation with frontline actors in the criminal justice system. *See* 28 U.S.C. §991(b)(1)(C), § 991(b)(2), § 994(o), § 995(13), (15), (16). The original Commissioners abandoned the effort to design the guidelines based on the purposes of sentencing because they could not agree on which purposes should predominate, and instead purportedly developed the guidelines based on an empirical study of time served for various offenses before the guidelines. *See* USSG, Ch. 1 Pt. A(3); Justice Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1, 7 (1988).

In *Rita v. United States*, 551 U.S. 338 (2007), the Supreme Court gave two reasons that it may be "fair to assume" that the guidelines "reflect a rough approximation" of sentences that "might achieve § 3553(a)'s objectives." First, the original Commission used an "empirical approach" which began "with an empirical examination of 10,000 presentence reports setting forth what judges had done in the past." Second, the Commission can review and revise the guidelines based on judicial feedback through sentencing decisions, and consultation with other frontline actors, civil liberties groups, and experts. *Id.* at 348-50.

The Court recognized, however, that not all guidelines were developed in this manner. *See Gall v. United States*, 552 U.S. 38, 46 & n.2 (2007); *Kimbrough v. United States*, 552 U.S. 85, 96 (2007). When a guideline "do[es] not exemplify the Commission's exercise of its characteristic institutional role," because the Commission "did not take account of 'empirical data and national experience,'" the sentencing court is free to conclude that the guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." *Id.* at 109-10.The fraud guideline is not based on empirical data of past practice or on national experience since then. Because the Commission failed to rely on empirical data or national experience in promulgating or amending § 2B1.1, and thus failed to fulfill its institutional role, this Court is free to disagree, on reasoned policy grounds, with its recommendation. *See Pepper v. United States*, __ S. Ct. __, 2001 WL 709543, *13 (Mar. 2, 2011); *Spears v. United States*, 129 S. Ct. 840, 843 (2009); *Kimbrough*, 552 U.S. 101-02, 109-10; *Rita*, 551 U.S. at 351, 357.

Moreover, while the amount of "loss" is the primary determinant of the offense level for

fraud offenders, loss is a highly imperfect measure of the seriousness of the offense. *See United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006) (criticizing "the inordinate emphasis that the Sentencing Guidelines place in fraud on the amount of actual or intended financial loss" without any explanation of "why it is appropriate to accord such huge weight to [this] factor[ ]"). The amount of loss is often "**a kind of accident**" and thus "**a relatively weak indicator of [ ] moral seriousness . . . or the need for deterrence**." *See United States v. Emmenegger*, 329 F. Supp. 2d 416, 427-28 (S.D.N.Y. 2004) (emphasis added). Defendants rarely set out to defraud others of a specific amount of money; rather, the amount of loss is dependent on the security procedures in place and the point in time when the fraud happens to be detected. *Id.* "Had [the defendant] been caught sooner, he would have stolen less money; had he not been caught until later, he would surely have stolen more." *Id.*

## B.     The Base Offense Level Was Increased By One Level In Response to Political Pressure and Against the Commission's Better Judgment.

In 2003, the base offense level was increased from six to seven for defendants convicted of an offense with a statutory maximum of 20 years. *See* USSG App. C, Amend. 653 (Nov. 1, 2003). The Sarbanes-Oxley Act had raised statutory maximums for most fraud offenses after a "bidding war" in Congress. *See* Frank O. Bowman III, *Pour Encourager Les Autres?*, 1 Ohio State J. Crim. L. 373, 404 (2004). Thus, the one-level increase resulted in an increase of 13 to 16 months for a fraud offender with a guideline offense level of 32 rather than 31, including Neal.

As its stated reason, the Commission pointed to Congress's directive in section 905(b)(2) of the Sarbanes-Oxley Act, Pub. L. No. 107-204, which instructed it to consider whether the guidelines are "sufficient to deter and punish" certain economic crimes "in view of the statutory increases in penalties contained in the Act." *See* USSG App. C, Amend. 653 (Nov. 1, 2003) (Reason for Amendment). Having just substantially raised penalties in 2001, the Commission could have narrowly targeted the high-end corporate scandals that prompted the Sarbanes-Oxley Act. That is what all commentators (other than the Department of Justice) advised, and the empirical evidence showed that across-the board-increases were unnecessary. The Department of Justice, however, placed intense pressure on the Commission to raise sentences for all fraud offenders, privately threatening to go back to Congress for a more specific directive if the Commission did not comply with the Department's wishes. The Commission initially resisted. However, nine months after the Sarbanes-Oxley Act was enacted, one Senator unilaterally inserted into the congressional record a "legislative history" stating that Congress meant the Commission to raise sentences for both high and low-level fraud offenders, with special attention to the "penalty gap" between fraud and narcotics cases. *See* Bowman, *supra*, at 411-32.

Accordingly, the Commission raised the base offense level from six to seven, stating that the amendment "responds to increased statutory penalties" and that the higher base offense level is "intended to calibrate better the base guideline penalty to the seriousness of the wide variety of offenses referenced to that guideline, as reflected by statutory maximum penalties established by Congress." *See* USSG App. C, Amend. 653 (Nov. 1, 2003). In doing so, the Commission once again ratcheted up the fraud guideline to more closely match the unsound drug guidelines, and explicitly tied the base offense level to the statutory maximum, thus abdicating to Congress its independent judgment regarding the seriousness of the offense. *See* Bowman, *supra*, at 434.

**C.     Mr. Goyal's guideline range is over 600% of the average past practice sentence And 500% of the original guideline range.**

Neal's guideline range is 121-151 months. Before the guidelines, first offenders convicted of sophisticated embezzlement involving the highest loss amounts who were sentenced to prison served, on average, 30-37 months, and 1% of such defendants received probation. *See* U.S. Sent'g Comm'n, *Supplementary Report on the Initial Sentencing Guidelines and Policy Statements* 30 (1987), http://www.src-project.org/wpcontent/ pdfs/reports/USSC_Supplementary%20Report.pdf. First offenders convicted of sophisticated fraud involving the highest loss amounts who were sentenced to prison served, on average, a prison sentence of 18-24 months, and 18% of such defendants received probation. *Id*. at 33.

When the Commission adopted the original guidelines in 1987, it "decided to abandon the touchstone of prior past practice" with respect to white collar offenses. Breyer, *supra*, 17 Hofstra L. Rev. at 22-23. The Commission required some form of confinement for all but the least serious cases, and adopted a fraud guideline requiring no less than 0-6 months and no more than 30-37 months for defendants in Criminal History Category I. *See* USSG § 2F1.1 (1987). The Commission explained that "the definite prospect of prison, though the term is short, will act as a significant deterrent to many of these crimes, particularly when compared with the status quo where probation, not prison, is the norm." USSG, ch. 1, intro., pt. 4(d) (1987); *see also* U.S. Sent'g Comm'n, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform* 56 (2004) [hereinafter *Fifteen Year Report*] (Commission sought to ensure that white collar offenders faced "short but definite period[s] of confinement").

The Commission's deterrence rationale was not based on empirical evidence. The empirical research regarding white collar offenders shows no difference between the deterrent effect of probation and that of imprisonment. *See* David Weisburd *et al.*, *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995). "[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders." Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 448-49 (2007).

Moreover, the Commission quickly abandoned its original goal of ensuring "short but definite" sentences. Beginning just two years after the Guidelines went into effect, prison sentences for fraud offenders were steadily increased. The effect of those increases on this case was to add four levels for loss in 1989, to add five more levels for loss in 2001, to increase the base offense level by one level in 2003, and to add four levels for the number of victims in 2001 and 2003. As a result, Neal Goyal's advisory guideline range is **now over five times the range under the original 1987 guideline**s. If Neal had been sentenced under those guidelines, he would have a base offense level of 6, an increase of 11 for the amount of the loss (over $5 million), an increase of 2 for more than minimal planning and a scheme to defraud more than one victim. With 2 points off for acceptance of responsibility, he would have a total offense level of

17 and a guideline range of 24-30 months. His guideline range under the 2015 model is 121-151, an increase of over 500%.

## D. The Specific Offense Characteristics Applicable in this Case Impose Cumulative Punishment for the Same Harm.

The first fraud guideline, § 2F1.1, included two specific offense characteristics in addition to loss, one with four subparts applicable in the alternative and one that required a floor of 12 levels. *See* USSG § 2F1.1 (1987). Today, § 2B1.1 includes sixteen cumulative specific offense characteristics, many with multiple alternatives. *See* USSG § 2B1.1 (2010). In the initial set of guidelines, if there was "more than minimal planning" and "more than one victim," one 2-level enhancement applied. Today, "sophisticated means" and "10 or more victims" cumulatively produce a 4-level enhancement – totaling an additional 27 months.

Four of the levels used to calculate Neal's guideline range -- totaling an additional 27 months -- come from specific offense characteristics in § 2B1.1 (2 levels for number of victims, 2 levels for sophisticated means). These factors are "closely correlated" with each other and with loss. *See* Frank O. Bowman III, *Sentencing High-Loss Corporate Insider Frauds After Booker*, 20 Fed. Sent. R. 167, 170, 2008 WL 2201039, at *6 (Feb. 2008). "In effect, what the Guidelines have done over time is to tease out many of the factors for which loss served as a rough proxy and to give them independent weight in the offense-level calculus." *Id.* "The result is that many factors for which loss was already a proxy not only have been given independent weight but also impose disproportionate increases in prison time because they add offense levels on top of those already imposed for loss itself and do so at the top of the sentencing table where sentencing ranges are wide. . . . Any case involving a corporate officer and a multimillion-dollar fraud will almost always trigger application of multiple offense-level enhancements that have the effect of punishing the defendant over and over for the same basic thing – conducting a big fraud in a corporate setting." *Id.* at *7. *See also* Samuel W. Buell, *Overlapping Jurisdictions, Overlapping Crimes: Reforming Punishment of Financial Reporting Fraud*, 28 Cardozo L. Rev. 1611, 1648-49 (2007) (factors such as sophisticated means and large number of victims "double-count because they are captured by other enhancements or by the loss calculation."); Alan Ellis, John R. Steer, Mark Allenbaugh, *At a "Loss" for Justice: Federal Sentencing for Economic Offenses*, 25 Crim. Just. 34, 37 (2011) ("the loss table often overstates the actual harm suffered by the victim," and "[m]ultiple, overlapping enhancements also have the effect of 'double counting' in some cases," while "the guidelines fail to take into account important mitigating offense and offender characteristics.").

The Commission has recognized this problem of "factor creep," in which as "more and more adjustments are added to the sentencing rules, it is increasingly difficult to ensure that the interactions among them, and their cumulative effect, properly track offense seriousness." *Fifteen Year Report* at 137. In 1999, Justice Breyer warned that "[t]here is little, if anything, to be gained in terms of punishment's classical objectives by trying to use highly detailed offense characteristics to distinguish finely among similar offenders. And there is much to be lost, both in terms of Guideline workability and even in terms of fairness (recall the Guidelines' logarithmic numerical scales). . . . The precision is false." *See, e.g.*, Justice Stephen Breyer,

*Federal Sentencing Guidelines Revisited*, 11 Fed. Sent'g Rep. 180, 1999 WL 730985, at *11(1999).

Since the Commission has not corrected the problem of multiple overlapping enhancements, many courts have recognized that a departure or variance is warranted to avoid it. *See, e.g.*, *United States v. Lauersen*, 362 F.3d 160, 164 (2d Cir. 2004) (subsequently vacated in light of *Booker*) (upholding departure to mitigate effect of "substantially overlapping enhancements" at the high end of the fraud sentencing table); *United States v. Parris*, 573 F. Supp. 2d 744, 745 (E.D.N.Y. 2008) (guidelines in security fraud cases "are patently absurd on their face" due to the "piling on of points" under § 2B1.1); *United States v. Adelson*, 441 F. Supp. 2d 506, 510 (S.D.N.Y. 2006) (guidelines in fraud cases have "so run amok that they are patently absurd on their face," and describing enhancement for "50 victims or more," along with others, as "represent[ing], instead, the kind of 'piling-on' of points for which the guidelines have frequently been criticized").

## E.    Recent Proposed Amendments to the Guidelines Reveal Further Weaknesses in the Current Guidelines and Reveal Further Reasons for Criticism

Recent proposed amendments to the guidelines further weaken their effective use in cases such as this. Two of the five proposed amendments affecting fraud and economic crimes are of particular note here, one is the "Inflation Adjustment" and the second involves what exactly constitutes sophisticated means. In a recent online column for www.jurist.org, Professor Randall D. Eliason of the George Washington University Law School wrote about the proposed relaxed sentencing guidelines:

> In a fraud case the single biggest driver of the offense level is the loss caused by the defendant's conduct . . .Since the fraud table was last revised in 2001 the dollar amounts defining the different levels have not been adjusted for inflation, which has resulted in "bracket creep." A crime that caused $100,000.00 in damage in 2001 would cause more than $130,000.00 in damage today, due to the effect of inflation. That would place it higher in the fraud table and result in a greater sentence for the same crime. **The Commission proposes adjusting the amounts in the table to bring them back into line with what they represented in 2001, which would reduce the average sentence under § 2B1.1 by more than 20 percent**.

> \*                                    \*                                    \*

> Sophisticated Means: The fraud guideline contains a two level enhancement for offenses that involved multiple jurisdictions, overseas bank accounts, shell corporations, or other types of "sophisticated means." § 2B1.1(b)(10). The Commission proposes modifying this provision to specify that it will apply only when the sophisticated means employed were truly unusual relative to other similar cases and only when the defendant personally engaged in or caused the conduct constituting sophisticated means.

http://jurist.org/forum/2015/04/randall-eliason-sentencing-guidelines.php. (Emphasis Added) It seems plain that by not keeping up with inflation that the guidelines are particularly wrong.

## IV.   CONCLUSION

Neal made mistakes and poor decisions that allowed himself to become the type of person that he never thought he would be – a criminal defendant about to be sentenced for injuring the victims in this case.  But as this memo and the letters to the Court have shown, this is but a small part of who he is.  Neal is a person of great love, compassion and dedication and he has seen the errors of his ways.  He can and does blame no one but himself for his mistakes.  He will, whatever the sentence of this Court, seek to return to become the person that his loved ones know that he is.  Neal realizes that as part of this process, he must leave his family and go to prison but he respectfully and humbly pleads with this Court that the sentence be a just and proper one.  The sentence should be no greater than necessary and he believes that a sentence of 18 months is sufficient.  Neal will rise again.  He will work tirelessly to take care of his family, make the world a better place because of his actions and pay back the victims of his crimes.

For the foregoing reasons, Mr. Goyal respectfully submits that a sentence of 18 months in prison followed five years' supervised release is sufficient, but not greater than necessary, to satisfy the purposes of sentencing.

Respectfully submitted,


By: s/Thomas More Leineneweber
      Thomas More Leinenweber

Thomas More Leinenweber
Leinenweber Baroni & Daffada, LLC
203 North LaSalle, Suite 1620
Chicago, Illinois 60601
312-663-3003


James L. Kopecky
Howard Rosenburg
Kopecky Schumacher Bleakley Rosenburg PC
203 North LaSalle, Suite 1620
Chicago, Illinois 60601
(312) 380-6552